947 F.2d 946
 6 IER Cases 1648
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED AUTOMOBILE AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA, LOCAL 1077, Plaintiff-Appellant,
v.
SHADYSIDE STAMPING CORPORATION, Defendant-Appellee.
 
 No. 91-3243.
 United States Court of Appeals, Sixth Circuit.
 Nov. 8, 1991.
 Before MILBURN and SUHRHEINRICH, Circuit Judges, and JORDAN, District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff United Automobile Aerospace & Agricultural Implement Workers of America, Local 1077 ("Union"), appeals the district court's decision granting summary judgment for alleged violations of the Worker Adjustment and Retraining Notification Act ("WARN" or the "Act"), 29 U.S.C. § 2101-09, and regulations promulgated pursuant thereto by defendant Shadyside Stamping Corporation ("Shadyside" or the "Company"). The district court granted summary judgment on the grounds that Shadyside acted in good faith and with a reasonable belief that it was in compliance with the Act. The court found no damages and dismissed the case. We affirm.
 
 
 2
 * Shadyside is a small sheet metal stamping manufacturer with two principal customers, Navistar and General Motors. As of January 1989, Shadyside employed approximately 240 bargaining-unit employees, represented by plaintiff Union, and approximately twenty-five management and clerical employees.
 
 
 3
 In the summer of 1988, Shadyside learned that Navistar would be removing its work from Shadyside. On September 27, 1988, H.L. Roth, then the president of Shadyside, sent a letter to the local's president, Ron Swisk. The letter informed the Union of Navistar's intentions and stated that the removal would begin on February 1, 1989 and continue until April 30, 1989. The letter continued: "Based on this information, this is your notification that we will be laying off in excess of 50 employees after February 1, 1989 or sooner." A follow-up letter to Swisk dated January 4, 1989 stated:
 
 
 4
 This letter is just a reminder to advise you that we are still contemplating a layoff after February 1, 1989, as we referred to in our letter dated September 27, 1988. We will be trying to replace the Navistar work, but we do not have work to replace all of it at this time.
 
 
 5
 The letter did not contain specific dates, numbers or names.
 
 
 6
 Shadyside laid off thirty-one bargaining unit employees on February 3, 1989, and fifteen more on February 27, 1989. In February and March 1989, five bargaining unit employees voluntarily retired or resigned.
 
 
 7
 On March 15, 1989 Roth again wrote Swisk, informing the Union that General Motors had withdrawn a substantial purchase order, thereby requiring additional layoffs. The March 15 letter indicated that the layoffs would begin around April 3, 1989. On that day, an additional sixty-six bargaining unit employees were laid off by Shadyside. A letter from Shadyside dated April 10, 1989 further explained the April 3 layoffs, stating that the sixty-six layoffs were in accordance with the labor contract and it listed the affected positions and employees.
 
 
 8
 Shadyside also laid off management and clerical employees at this time. Four management employees were laid off on March 31, 1989; one clerical employee was laid off on March 24, 1989, one on March 31, 1989, and one on April 10, 1989.
 
 
 9
 On April 10, 1989, Shadyside notified the Union of projected layoffs planned for June 9, 1989. This letter detailed that fifty or more employees would be temporarily laid off, on or about June 9, 1989, and that the layoffs would be made in accordance with the labor contract with regard to seniority and bumping rights. Further, enclosed was a list of the job titles of positions to be affected, the number of employees in each job classification, and the names of the workers currently holding those jobs. A subsequent letter dated June 2, 1989 informed the Union that the company intended to lay off 26 bargaining unit employees.
 
 
 10
 The Union brought suit on May 15, 1989 seeking damages for the affected bargaining unit employees as well as attorney's fees and costs. The Union argued that the February 3 and 27, and April 3, 1989 layoffs constituted part of a mass layoff under the WARN Act and that all employees were therefore entitled to sixty days advance notice.
 
 
 11
 The parties filed cross-motions for summary judgment. The district court held that there was a genuine issue of material fact regarding substantial compliance with the Act. However, the court also determined that the Company had acted in good faith and that the Union was not entitled to recover any damages. It therefore granted summary judgment for Shadyside. This appeal by the Union followed.
 
 II
 
 12
 We review a district court's grant of summary judgment de novo. EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990). Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Canderm Pharmacal, Ltd. v. Elder Pharmaceutical, Inc., 862 F.2d 597, 601 (6th Cir.1988).
 
 
 13
 Subject to certain exceptions, WARN requires employers of one hundred or more employees to give at least sixty days advance notice of a plant closing or mass layoff to affected workers or their representatives, to the state dislocated worker unit, and to the chief local official of the location were the layoff is to occur. WARN was enacted on August 4, 1988 and became effective February 4, 1989. 29 U.S.C. § 2101.
 
 
 14
 The Act requires all employers of one hundred or more employees to provide sixty days prior notice of "employment losses" caused by a "mass layoff" or "plant closing." 29 U.S.C. § 2101(a). An "employment loss" is defined as an employment termination (other than discharge for cause, voluntary departure, or retirement), a layoff in excess of six months, or a reduction in hours of work of more than fifty percent during each month of any sixth month period. Id. § 2101(a)(6). A "plant closing" is the temporary or permanent shut down of an employment site that results in an employment loss to fifty or more employees. Id. § 2101(a)(2). A "mass layoff" means a reduction in force that results in an employment loss at a single site of employment during any thirty day period for 1) at least fifty employees and thirty-three percent of the employees at the site; or 2) at least five hundred employees at the site. Id. § 2101(a)(3). The sixty day notification period may be reduced, however, "if the plant closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time notice would have been required." Id. § 2102(b)(2)(A).
 
 
 15
 The Act itself does not specify what information is to be included in the notice to employees. It does, however, authorize the Secretary of Labor to "prescribe such regulations as may be necessary to carry out [the] Act." Id. § 2107(a). On December 2, 1988, the Secretary of Labor established Interim Interpretive Rules. See 53 Fed.Reg. 48884. On December 5, 1988, the Secretary of Labor published proposed rules that were identical to the interim rules. 53 Fed.Reg. 49076. The final rules were published on April 20, 1989, 54 Fed.Reg. 16042 and codified at 29 C.F.R. § 639.7.
 
 
 16
 The enforcement provisions of the Act are found at section 2104(a). Section 2104(a)(1) provides that any employer who orders a mass layoff or plant closing in violation of section 2102 shall be liable for "back pay for each day of violation," including the cost of fringe benefits, up to a maximum of sixty days back pay. Id. § 2104(a)(1). The Act may be privately enforced against employers by employees, their representatives, or a local government. Id. § 2104(a)(5). Attorney's fees are available to a prevailing party in a suit to enforce the Act. Id. § 2104(a)(6).
 
 
 17
 Under certain circumstances, an employer's liability may be reduced. The reduction provision at issue in this appeal is section 2104(a)(4). It provides:
 
 
 18
 If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.
 
 
 19
 29 U.S.C. § 2104(a)(4).
 
 
 20
 The district court found a genuine issue of material fact as to whether Shadyside violated the Act. However, the district court also found that even if Shadyside violated the Act, it did so in good faith. Exercising the discretion granted under section 2104(a)(4), the district court ruled that no damages should be awarded.
 
 
 21
 We agree that Shadyside acted in good faith. Shadyside notified its employees of the layoffs more than four months in advance. This notice informed the employees that layoffs would continue through April 30, 1989. Moreover, Shadyside provided a reminder notice in January 1989. The day after it was withdrawn, Shadyside gave the Union notice of the cancellation of the General Motors purchase order and the layoffs it would cause. Although the various notices provided by Shadyside may not have complied with the requirements set forth in the regulations, 29 C.F.R. § 639.7, they did include much of the required information. During the period in question, Shadyside's circumstances were rapidly evolving. It was facing unforeseen developments, such as the cancellation of the General Motors purchase order, and attempting to replace work it had recently lost. In this situation, the lack of scientific precision in the layoff notices does not vitiate good faith.
 
 
 22
 As the district court found, Shadyside knew of the Act, attempted to comply with the Act, and had reasonable grounds for believing it had complied with the Act. On this record, it was within the district court's discretion under 29 U.S.C. § 2104(a)(4) to conclude that no damages should be awarded.
 
 
 23
 The Union also claims a finding that Shadyside violated the Act would entitle it to attorney's fees and court costs. We disagree. Under the Act, "the court, in its discretion, may allow the prevailing party a reasonable attorney's fee...." 29 U.S.C. § 2104(a)(6). The Union is not a prevailing party. The WARN Act adopted the definition of "prevailing party" established under the Civil Rights Act, 42 U.S.C. § 1988.[1] The Sixth Circuit employs a two-prong test to determine whether a party has prevailed. The party must demonstrate that the lawsuit " 'was causally related to securing the relief obtained' " and that its claim is not " 'frivolous, unreasonable or groundless.' " Banchy v. Republican Party of Hamilton County, 898 F.2d 1192, 1194 (6th Cir.1990) (quoting Johnston v. Jago, 691 F.2d 283, 286 (6th Cir.1982)). The Union fails the first prong of this test. Since we affirm the district court's denial of damages, the Union has secured no relief and cannot be considered a prevailing party. Thus the district court properly refused to award the Union attorney's fees.
 
 
 24
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation
 
 
 [1]
 The Senate Report established that the "standard for determining an entitlement to fees, and the method of determining the amount of the fees, are to be those already established pursuant to the Civil Rights Attorneys Fees Awards Act of 1978, 42 U.S.C. sec. 1988." S.Rep. No. 62, 100th Cong., 1st Sess. 24 (1987) (committee report on S. 538). S. 538 was later added as an amendment to H.R.3. It emerged from H.R.3 after a presidential veto as S. 2527, which was then enacted as WARN